May it please the Court, my name is Kay Frank. I represent Ms. Hernandez on behalf of the Northwest Women's Law Center and Council. And we are here to appeal the ruling of the BIA on each one of its holdings. We believe that the BIA erred when it affirmed the denial of adjustment by Judge Anna Ho, the immigration judge who held the hearing in this matter. We believe that there were three errors of law in that holding by the BIA. The first error being that the BIA relied only on one piece of evidence in the record. A letter, consular letter dated February 19, 1997 in packet 3. And there were numerous other pieces of evidence in the record that support the fact that Ms. Hernandez had an approved I-130 petition. Mr. Counsel, maybe I'm interrupting you, but you've got 20 minutes, that's plenty of time I think. I don't understand where you're going, even if I agree that this was cruelty. Whether or not she was beaten in Mexico or here, or whether or not the threats and her condition in the United States included total picture cruelty. Where does that get you? I mean, so you go back, but you're not going to get suspension now because he's gone. There's not going to be any cruelty at this point. Your Honor. How are you going to get adjustment of status? Under the VAWA, well, adjustment of status is one of our legal arguments. The suspension of deportation under the VAWA statute is a separate legal argument. She does not have to be in a present relationship. She does not have to be presently battered under the VAWA suspension of deportation regulations. She merely has to have been, merely. She must have been subject to battery or extreme cruelty in the United States by her husband. Those are the standards. So what? Can you get suspension of deportation forever? Suspension of deportation, yes, you do. Forever? Yes. The cruelty is long gone? Yes. Yes, you do, Your Honor. That is the law. She has been in the United States for three years, and under the statute as it existed at that time, Section 244A3, yes, she gets suspension of deportation and the right to remain here permanently. Well, there's two questions really that are difficult questions that are involved with this particular. I know you start off with adjustment, but Judge Reedley's got you now, and we're into suspension. I'm happy to talk about the VAWA, certainly. We might as well talk about that. Sure. The difficult question here, apart from the – we'll talk about jurisdiction in just a minute, but on the standard is whether or not she did suffer cruelty in the United States, which is what the statute provides for. That's correct. And as I understand your argument, which you – there's no question here from her testimony, which the Board cannot be credible, that the batteries or the beatings took place in Mexico, not in the United States. That's correct. Right. And so the argument that you make is what happened in the United States, the telephone calls that she received in the United States and his traveling to the United States and persuading her to relocate or return to Mexico is all part of the cycle of violence which qualifies within – domestic violence which can be – which can fall within the extreme cruelty provision, especially when you look at the regulation that the INS adopted.  But it is – can the statute be read that way, though, to incorporate this cycle of violence? I believe it can be read that way. And, in fact, I think it must be read that way because the statute states that she has to have been subject to battery or extreme cruelty. And I think that the regulations and the Immigration Service itself recognize that extreme cruelty does not require physical violence. And that the language of the CFR that relates to this subject, which is 208 CFR 2042C6, says that the term battery or extreme cruelty encompasses more than physical violence. And I'll quote – I'll quote it. Other abusive actions may also be acts of violence under certain circumstances, including acts which in and of themselves may not initially appear violent, but are part of an overall pattern of violence. So when you have somebody who does what Ms. Hernandez's husband did, who saw her out, she escaped his violence, a very severe beating. He sought her out in a place where she thought she was physically and emotionally safe from him, her sister's home in California. He found her there. He pursued her. He persisted and persisted. He called every day. He essentially involved her family in his violent tendencies towards her by pursuing her there, coming there, and then using coercive tactics, psychologically addressing her. I think you have to step back even one level beyond that. Well, first of all, I assume extreme cruelty is something different than cruelty. Although I remember in the old days, you know, in California before the no-fault divorce, extreme mental cruelty was the common ground for divorce. And it seems like almost anything would meet that. But you have to assume Congress meant something different by extreme cruelty than just cruelty. And the question is, though, if that's true, doesn't that import some discretion in the agency to make that determination? And if that's so, then, you know, is judicial review barred because it's a discretionary opinion? Well, Your Honor, judicial review is definitely warranted in this BIA opinion because the BIA didn't address extreme cruelty. The BIA opinion was very explicit, and I'll quote you some of the language from that opinion. They failed totally to address whether she was subject to any cruelty, extreme or otherwise, in the United States. They said in the opinion, for purposes of this form of relief, the battery must actually occur in this country. And then they continued, this unambiguous statutory language cannot be ignored, where the batterer committed his violent acts outside the borders of the U.S. So the BIA clearly never got to the question here, was there extreme cruelty in the United States? They never addressed it because they only assumed for purposes of the statute and for purposes of extreme cruelty that the battery had to occur in this country in order for there to be extreme cruelty in this country. And that is simply a misreading of the statute. And the BIA cannot be affirmed on that. It must be reversed. So then at least this petition for review is based on a legal error. Absolutely based on a legal error. That the BIA misread the statute. Absolutely. Yes, Your Honor. It is based on a legal error, and the subject of whether it's discretionary or nondiscretionary really is not of import to this Court. I'd be happy to talk about it, but I don't think we can. Okay. But we would agree with you on your legal analysis or your legal question that you raise here.  At least on this claim. Right. The remedy would be to send it back. Yes, it would. I mean, I think that there has been no discussion, no determination. There were many facts in the record about what happened. But for the Court to even be able to address a finding of the BIA, I think it has to go back and the BIA has to do its analysis. And then we can decide at a later stage, if necessary, whether extreme cruelty is a finding, a factually-based inquiry, or whether it's a fact and a subjective-based inquiry. I mean, our position is that it's factual, that there have to be facts in the record. The BIA has to apply those facts, and that it's – there are statutes. There's the immigration regulations which talk about what is psychological abuse. And so there are a lot of indicators for the BIA in how it should arrive at that determination. All right. Now, what about your other claim, which depends upon the – Adjustment? Yeah, the availability of a visa, right? Okay. Back to the visa number. That's where you intended to start, I know. That's correct. But I wanted to get to the other point as well. So everything that is in the record points to the fact that Ms. Hernandez had an approved visa petition. She had several letters from the Immigration Service which gave her a priority date. You don't get a priority date unless you have an approved visa petition. There's no argument by counsel that these documents are fraudulent. These are documents that came from the U.S. government, different agencies. The argument is that she has not produced records which she has no control over. She has not produced the approval notice. She's not entitled to have that approval notice. It goes to the petitioner of the husband who abused her. The government could get that approval notice. It made some effort, but it was not successful. But it wasn't unsuccessful. It simply said, we tried. We haven't heard anything. The burden in this case, when you have a victim of domestic violence who is seeking adjustment, really ought to be on the government to produce the records over which it has control. It didn't produce those records. The records that are in evidence are probative and I think are reasonably interpreted to show that a visa number was immediately available. And the government does nothing to show that it wasn't available. Roberts. Intricacies of this whole system then crop up here because there's this whole business about whether or not the visa number must have been issued to her, not her, directly to her. You are correct. That is another error that the I.J. or the BIA made because the allocation of a visa number is different than saying that a visa number is immediately available. The allocation is done by the government at the time that she has been found to meet all the eligibility requirements and after the exercise of discretion has been favorably granted that she should be permitted to adjust. Once all of that has happened, then it is incumbent on either the Immigration Service, if it's done in this country, or the I.J. or the consulate, to contact the State Department and say an immigration number was immediately available to her. Allocate it. That's not her burden. That's not her burden. And she has no control over that. So putting aside for a moment the marital issue problem, putting that aside. Yeah. Assuming it's okay. Right. The I.J. would ask the State Department to issue the I.J. number?  Absolutely. They would because the visa number is immediately available. We know that because she has a priority date and the visa, the State Department visa bulletin says anything with a priority date before this has an immediate availability of the number. So we know the number is available. Sometimes there's a little backsliding after the application and they have more applications and they kind of have to hold on to the numbers. So they have to, the INS has to call or somebody has to call the adjudicator and say, okay, she's passed every hurdle. Is the number still there? Yes. We allocate it. Then she gets the seal of approval. But it's the last step after everything else is done. And the I.J. went one step further. I mean, well, the I.J. did consider all of this, or at least said assuming that she had, that she qualified and whatnot. Right. And that. Now, I would exercise my discretion and I would deny it. Absolutely. Because the marriage has fallen apart. Now, why do we have jurisdiction to do that and could she do that? Well, she can make that statement. But it's a total error of law for her and it was an error of law for the BIA to affirm that exercise of discretion. And the reason it was is because the INS, the BIA has several precedential holdings, rules, cases. Two of them are Atalatka and Boroman, both of which I think are cited in our briefs, that hold directly contrary to that holding. And those cases say that failure, failure that, I'm sorry, that to rely on the viability of, solely on the viability of the marriage to deny adjustment of status is no longer the rule under BIA. The non-viability. The non-viability, sorry. The non-viability of the marriage. So if, as it did here, the BIA relies solely on the non-viability of the marriage to deny adjustment, its holding is contrary to precedential rulings of the BIA itself. And that is a due process violation for sure. It's also a violation of the Immigration Service's own rule. It's not something that, you know, even though it could be characterized as a mistake, I mean, speaking hypothetically, it's not something that comes within the discretion of the agency? No. You cannot exercise discretion contrary to your precedential holdings. And the ACFR 3.1G says, Decisions of the board as precedent, except as may be modified or overruled by the Attorney General, decisions of the board shall be binding on officers, employees of the service, or the immigration judges in administration of the act. And selected decisions designated by the board shall serve as precedent in all proceedings. The two cases that I refer to are precedential decisions. The I.J. has no authority to rule contrary. Do those cases arise in the context? See, I think what the government's position is, is, well, we acknowledge that only with respect to, quote, eligibility. No. And then when we're over in the area of the ultimate question of discretion, they say we can consider the non-viability as a matter of, quote, discretion. These cases stand for the proposition that that is not a matter of discretion in adjustment of status. They are very explicit. They do not go to eligibility. They go to the matter of exercise of discretion. And the I.J. may have other reasons to exercise discretion, but cannot exercise discretion to deny adjustment solely on the viability of the marriage. And these cases came after the case, Menendez, that the judge relied on and that the government is relying on. And one of them explicitly discusses Menendez and rejects by its holding, rejects the Menendez dicta, which is clearly just dicta. And there's no case that we have found, either a BIA case or circuit case, that permits this kind of ruling. And especially when you look in the context of the fact that this is a domestic violence situation, of course the marriage is not viable because this man has beaten and tried to kill this woman and was almost successful. So how can you hold against her that her marriage is dead? In fact, it should be a positive equity weighed in her favor at this point, not and not the sole reason that this can be denied. And there is the ultimate remedy here, though, would be if we would agree with you, that would have to go back to the board. Or could we just order, they had their chance, they had their best shot and they took it, and we can order. I don't think they can go back now and say, well, gee, even though we said that was the only reason, now we're going to find a bunch of other reasons. I think it's too late for them. I think they had their shot at that. I don't think they have an opportunity to reconsider and find other reasons. I know that the, you know. You've got about two minutes left.  I'd like to save my time. Thank you. Thank you. Thank you again, Your Honors. Good morning. John Cunningham again for the Department of Justice. Just a brief housekeeping matter, if I may, at the beginning of my presentation. The respondent in this case is listed on the briefs as the INS, and as we've told the Our suggestion is that the attorney general now be listed as the respondent. That's because the attorney, because the BIA is still in the Department of Justice. That's correct, Your Honor. And the BIA acts as a delegate of the attorney general. So although the successor to the INS is in the new department, that's BIA stays in the DOJ. That's correct. That's correct. That's correct. I'll begin where my colleague began with the adjustment question. With respect to the whether Ms. Louise Hernandez was eligible for an adjustment of status, the record is, as we said in our brief, clouded and inconclusive. And the standard of review is whether the board was compelled to find that she had established her eligibility for adjustment, that any reasonable fact finder would be compelled to conclude that she had, in fact, established her eligibility. We submit that on this kind of a record, you cannot reach that determination, and the eligibility determination shouldn't stand on that ground alone. Well, this, for example, this letter that we just, that was just submitted to us not too long ago? Yes, Your Honor. I should note that that letter is actually in the record, so the submission to you was properly in the record. It was in the record. This is pretty strong. That's a pretty strong indication that something was going on here. It's a good indication that an adjustment of a petition, an I-130 petition, was filed on this person. And that she was eligible. That it's an indication that an approval may have been issued. Yes, Your Honor. It's strong. Yes, it is. Yes, it is. What more does she need? She needs to show you the approval itself or she needs to show you the allocation of the reason. But she couldn't do that, could she? I don't see why not. If she had a reason. Who petitions for her? Her husband did. And according to the government, the notice goes to her husband. Yes. I don't know. And the record here speaks that, I mean, as the counsel just pointed out, this was a difficult situation between the petitioner and her husband. Yes. Yes. Even the board gave, you know, said she was credible. Yes. Yes. There's no dispute as to the essential fact of the case. Counsel said the government should have produced the notice. The government, the notice apparently does not exist, which is a problem. I mean, I don't know really who is responsible for producing it. Why do you say it apparently doesn't exist? Because no one can find it, Your Honor. Because you made a search for it? Yes. The INS, the INS. Yes. Yes. Excuse me. Did you finish your answer? Yes. The INS undertook at the hearing to inquire at the consulate in Mexico as to whether an approval was ever issued, and no such approval was turned up. This may be a bureaucratic mistake. I don't know. But the fact is that there is a whole group of people. It wouldn't be the first time. No, it would not be the first time. But that's actually my point. On the eligibility issue, the argument is being made to you that if the immigration bureaucracy works the way it's supposed to, this compels a conclusion that an approval was in fact issued, that these letters went out because they were supposed to, that the notification went out because it was supposed to. And one could conclude that an approval was issued, but the question is, was the board compelled to find that an approval was issued? And I submit to you that it's a large inference to make that the bureaucracy worked the way it's supposed to. There are too many holes missing on the eligibility question to be able to find out. So the only thing, but your position, your point is that what she really, the only thing that would really satisfy her burden would be to have the notice. This was insufficient. Yes. Yes. That's our argument. Now, on the discretionary aspect of the adjustment issue, I respectfully disagree with my colleague on how you read those board decisions that she cited. The facts of this case are very unusual. And what this case really is, is an asylum case under, but brought under different sections of the Immigration Act. This is not a case where a woman was brought to the United States by a lawful permanent resident or citizen husband and then found herself in a terrible domestic situation, found herself trapped, found herself with nowhere to go. The suspension and adjustment of status provisions exist to allow someone like that to stay in the U.S. and to establish her own status separate and apart from her abusive domestic spouse or lawful permanent resident spouse or citizen spouse. Here, the threat exists only in Mexico. Ms. Luis-Hernandez seeks protection, and she uses this word in her briefs, that the court should require the board to grant her protection from a particular situation. But the protection, the situation for which protection is sought for doesn't exist in this country. It's in a foreign country. It's in Mexico. That's why I draw the analogy to an asylum case. Ms. Luis-Hernandez is asking to stay in the U.S. so she is not required to return to Mexico where this threat supposedly exists. That's an asylum claim. But as the law, the law of the asylum provisions does not extend to individual instances of domestic abuse such as this one. But Congress has set up this scheme. Yes, Your Honor.  So we do – But we're now in the realm of discretion. And the board, I think, is entitled to look at this rather unusual situation where the marriage is over, where the spouse never lived in the U.S., where no one knows where the spouse is. At the time of the hearing, Ms. Luis-Hernandez had not heard from her husband in three years, did not know where he was. There was no evidence that he was threatening any of her relatives in Mexico, including her children by previous relationships. He was gone. Are you saying because this is the sort of the converse factual situation that the presidential decisions of the board just don't apply? Oh, no. No, they would apply, Your Honor, if they did apply. I mean, I'm not arguing that the board's precedents wouldn't apply in a situation that was truly applicable to. But here we've got a situation that really is the converse of the usual adjustment or usual suspension situations. Here we have a situation where Ms. Luis-Hernandez is free in the U.S., moves freely about, always was free in the U.S., except for one thing. She entered illegally in 1993 by coming across the border without a visa. That's her only problem. She is not under a threat. Well, she did go to get away from her husband. That's correct, Your Honor. And she, in order to, my point is really a simple one. In order to make the discretionary determination whether she was entitled on these facts, whether, I'm sorry, not entitled, because that's an eligibility terminology, whether she was, whether she ought to get adjustment of status on these facts is a discretionary determination. And the board was entitled to look at the reality of her relationship to the abuser. And where the abuser is not, is no longer part of her life, it's not, it's too simple to simply say the marriage was dead. The abuser was not part of her life. He was gone. He had not been heard from for three years. The board could, under its own precedence and under the statute, look at that reality in making a determination that even if she is eligible for adjustment, we don't think this remedy is the one she ought to get. Your position then is adjustment of status, the grant of adjustment of status is a discretionary decision. Is that right? Yes, Your Honor. And in making that decision, the board is entitled to take into account the fact, well, for instance, that the husband is still in Mexico, I guess. Yes. And, I mean, a grant of adjustment. This is not the typical situation where adjustment is petitioned for in a spousal abuse situation. That's correct. That's correct. I think the board is entitled to look at those kinds of situations, look at those kinds of facts, and weigh it. And my, our argument is really quite simple, that that is a discretionary determination. You see, but doesn't it bother you then that, but the bottom line of that decision is that, well, then you'll send this woman back, right back into the spousal abuse situation in Mexico. That's the outcome of the. No, with respect, Your Honor, that's not the outcome. Well, what is the outcome? She would have to return to Mexico where she has extensive family, where she has many brothers and sisters, her mother and her own two children. She would not have to go back to Mr. Acosta. She doesn't know where Mr. Acosta is. This is not that kind of case where she has nowhere else to go. That's what the Violence Against Women Act provisions, both in Section 244 and my colleagues' arguments under Section 245, are focused at. And it's clear from the literature and it's clear from Congress's legislative history that Congress was focusing on situations where a woman was brought here to this country by her husband through marriage and then beaten and had nowhere to go. So she was trapped economically, trapped psychologically, trapped emotionally, trapped culturally, perhaps, if divorce was a stigma in her religion. That's not this case. That is simply not this case. So you would say that when the Board or the gloss you put on the Board's statement here, they said, we affirm the district court, the immigration judge's discretionary determination to deny respondents' application for adjustment for the reason that the marriage is no longer in existence. There is no dispute that the marriage has completely deteriorated in this case. So you would want us to read that as you just explained it to us. Yes, Your Honor. And I think that under the statute. That's what they were really saying here. I think that the yes, I think. There's no longer any threat to her in Mexico. Yes. I mean, the marriage, there was no tie between her and her husband, that she had no reason to go. She was not forced to go back to her husband. She had other ways out. She's in a relationship in this country with a different man that she apparently was working very well for her. One of the oddities about this case, if I may say so, is that Ms. Luis-Hernandez didn't divorce her husband. She, for whatever reason, stayed in the marriage. I don't know why that is. She was in a good relationship in this country to a person who is a lawful permanent resident. There are ways that she could obtain relief through him if she chose to divorce. I don't know why she hasn't divorced. It may be because of the – I don't want to make too much of this. It may be because she's a Catholic. I don't know. But the fact is that in so many of these cases, and certainly what Congress had in mind, is that the woman was in a marital trap, and that's not this case. And I think it's important to note that in the case of Section 244A, there was no  There was no discretionary grant of adjustment under Section 245A. There was no discretionary grant of adjustment under Section 245 or the special provisions in Section 244A. And because the Board's determinations, both with respect to a discretionary grant of adjustment under Section 245 and its determination that the standard of proof had not been met under Section 244, are ultimately discretionary, ultimately discretionary under both provisions, we ask that the petition for review be dismissed under Section 309C4E of the Illegal Immigration Reform and Immigrant Responsibility Act transition provisions, which state that there shall be no appeal of a discretionary decision under Section 244 or Section 245. The Board's analyses under both of these provisions, 244 and 245, are ultimately discretionary and therefore nonreviewable. Yes, sir. Well, but what about counsel's point, sir, about under the Violence Against Women's Act, there was not a truly discretionary decision because the Board misconstrued the statute. Yes. Are we on suspension, ma'am? Yes, sir. Yes, sir. And the argument has been made by my colleague that the Board did not sufficiently articulate a separate finding under the extreme cruelty part of the statute and therefore, if nothing else, there should be a remand in this case. We've laid out in our brief the reasons why we think that that's simply not the case. And for starters, the Board did acknowledge the argument being made to it by the amici below. That's significant because the only reason amici were in the case was to argue that the limited actions by Acosta within the U.S. amounted to extreme cruelty. If the beatings had taken place within the U.S., we'd have a much simpler case. That would still be the ultimate discretionary determination to do, but we would have a much simpler case on eligibility. They came into the case in order to make the argument that his visit to Los Angeles and his persuasion of her to return with him to Mexico was part of a link, a cycle of domestic violence. And the Board knew. A pattern, as in the regulation. Yes. A pattern of domestic violence, that this was part of an unbroken chain. The Board knew that this argument was being made to it. It acknowledged that fact. It knew that the issue was there before it. And it made the ultimate finding that neither extreme cruelty or battery within the U.S. had been established. And I think that's sufficient. As we point out in our footnote, throughout the proceedings below, both in their pleadings and in the literature that they supplied to the immigration judge and the Board, Ms. Luis Hernandez and amici continually used battery as a hatchel for both parts of the And having seen that, I think the Board was entitled to use the same convenient shorthand in determining the case. As long as the Board made it clear that it understood the argument being made to it, and as long as it made it clear that it was deciding both half, both half of the conjunctive standard, it gave the Petitioner what she's entitled to. There was a reference to due process. A person appearing before a government agency has the right to know what the result of the case was and if she lost, why she lost. And Ms. Luis Hernandez got this here. There was no violation of due process. This is an adequate order. The Board's order is sufficient on that basis. Congress has seemed to be fairly generous in this one area of immigration. Yes. And it's become more. They amended the statute subsequently. Yes. Yes. I mean, if this all happened maybe a year later, she'd be home free. I don't know how much longer. Well, as we point out in our brief. One day she started the immigration. Yes. She started the deportation. Right. It's when she went into proceedings that sort of triggered which part of the statute applied. There was a sort of argument made, I think, in the reply brief by Ms. Luis Hernandez that the liberalization in 2000 of the battered women's provision should be read as an indication by Congress that previous cases should be decided liberally. That's a rather dangerous road to go down unless there's clear legislative history, which here there isn't, because, of course, no one would argue the obverse of that, which is that if Congress tightened the language, that nevertheless the previously existing case should be read strictly or tightly. So if you had, say, a committee report that said to you, well, we believe that existing cases should be read in light of the statutory amendment, then that would be a different story, but you don't have that. It's just simply a question of which provisions apply. There is no longer a dispute between the parties. I guess my comment meant to be that my comment was simply that, you know, we're so restrictive in the immigration area, and this is one area where they seem to be a little more generous. Yes. Yes. Yes. It is, and of course, and I suppose I need to say this, no one on my side of the courtroom here, I think I'm here by myself, is arguing that the incidents that occurred to Ms. Acosta were minor or were trivial. They certainly were not. But the question that the Board had before it was, well, what about the significance of Acosta's very brief contacts with the U.S.? And my colleagues have used strong terminology to describe his actions. There have been words used like stalking, harassment, coercion. Well, that's all in the eye of the beholder, which is why this is ultimately a discretionary case. The facts that Ms. Luis Hernandez established in her testimony were simply that he obtained the telephone number of the sister in Los Angeles from a relative in Mexico and called her. Now, he's not in the U.S. yet. He called her, and he persuaded her to allow him to come to see her in Los Angeles. That's all she said. There was no allegation, no testimony. There's no evidence that he threatened her in making these telephone calls. There's no testimony that he said, if you do not let me come see you, I will harm your children, I will harm your mother, I will throw your belongings out into the street, I will harm your relatives here in Mexico. There's simply nothing in this record along that line. She agreed to let him come to Los Angeles. He got on a bus and went up there. It appears from the record, it's a bit hard to tell, but it appears he was probably there no longer than a weekend, and he persuaded her to come back to her. Now, that's my word, persuaded. My colleague's word would be coerced. Again, it's a question of the eye of the beholder. But the testimony is simply that he persuaded her to come back to Mexico with him. Again, there was no testimony. He said a few sweet nothings to her. Apparently, he promised to be better. He apparently made a promise to go into counseling. But he did not threaten her. He did not say, again, he didn't say, if you don't come back with me, I'm going to harm you, I'm going to hit you, I'm going to hit your sister, I'm going to go back to Mexico and harm your sister. But as the literature all points out that the amici submitted to the board, that's just part of, you know, typical. It can be. A pattern of spousal abuse. It can be. And this is all a question of evidentiary weighing. I am not arguing to the Court that that could never be, that as a matter of law or a matter of evidence, that could never be a case under Section 244a3. My argument is simply that the board was not compelled to find that this was part of that case. We make the notation in our brief that it would be a lot stronger for Ms. Luis Hernandez if, having returned to Mexico with him, this is January of 1993, he immediately resumed beating her. Because then it would be you could draw a very strong inference that the representation in Los Angeles that he would seek counseling was a lie in order to resume beating her. But that didn't happen. The last ugly incident, the last assault, took place in either March or April of 1993. Again, the record is unclear because her testimony was unclear. So, again, the question is, well, what does that mean? There was a gap in time. How significant is that? Does that indicate, does that compel a finding that there was this unbroken chain? This linked chain of domestic violence? The board probably, the immigration judge could have found that, I think. The board could have found that. But the question is, did they abuse their discretion under the law in declining to make that finding? I submit to the Court they did not. My red light is on, unless the Court has any further questions. I thank the Court for your attention. Thank you. Dr. Buble. Thank you, Your Honor. A couple of matters. My colleague overstates, I believe, the Immigration Service's position with respect to its efforts to obtain the documents that Ms. Hernandez needed to prove her, the approval of the I-130. The fact is, they didn't get a response that said there are no such documents. The record leaves open the question of whether they even got a response. And I believe the record at page 377, the excerpt of the record, shows that they got, they did not, they just simply didn't get a response to their request. So they certainly didn't get anything that said there was no such document available. I want to say again that I don't think that the VAWA question is a question of exercise of discretion. It's a question of interpretation of the law. My colleague said that this Court should accept the BIA's shorthand. Surely a court does not render a decision in shorthand which other courts have to interpret and which the public has to rely on. That would be a violation of due process. And so this notion of shorthand simply cannot be the basis for finding that the BIA made a determination about extreme cruelty. It never made a determination, period. In fact, it erred as a matter of law when it said there couldn't be extreme cruelty if there was no battery in the United States. If the Court goes towards an analysis of what is extreme cruelty, our position is that it should be viewed as one does an asylum claim and persecution. There's a subjective component. What does the victim feel was extreme cruelty? And then one should have an objective component in which the Court analyzes the law, as it is given by the Immigration Service and Congress and social science research. It should look to international law to determine how the larger community views the question of extreme cruelty in the context of domestic violence. And if it does so, it will remove that decision from the biased or untutored or unknowledgeable decision-making by immigration judges and BIA panels who have no understanding of domestic violence independently. They must be relying on a larger experience than their own personal experience and judgment. As we can see with Judge Ho, she simply discounted every single thing that the client said. She had no understanding of domestic violence. So to put that kind of discretionary decision in the hands of somebody who really has no understanding is really not what Congress intended. Congress intended an informed, educated discussion about extreme cruelty and did not intend it to be a completely discretionary determination. Thank you. I want to thank both of you, Ms. Frank and Mr. Cunningham, for a very well-argued case. This case is submitted for a decision and being the last case on the argument calendar. The panel now stands in adjournment for the day.
judges: Reavley , Tashima, Paez